HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STEWART BATTLE, et al.,

        Plaintiffs,

       v.

CITY OF SEATTLE, et al.,

        Defendants.

CASE NO. C14-309RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on the parties' cross-motions for summary judgment.  Although the parties requested oral argument, the briefs and evidence that the parties submitted provide an adequate basis for the court's ruling.  For the reasons stated below, the court GRANTS Plaintiffs' motion for summary judgment (Dkt. # 21) in part and DENIES Defendants' motion (Dkt. # 25).  Because today's disposition does not end this case, Part IV of this order includes instructions to the parties to address the resolution of Plaintiffs' remaining claims and the entry of a final judgment.

## II.  BACKGROUND

Plaintiffs, the Lyndon LaRouche Political Action Committee and two of its Seattle-area organizers, prefer to spread their political messages by a practice they call "tabling."  They use a four-foot-by-two-foot portable table draped on its sides with political signs and covered on top with pamphlets or other political literature.  They place the table on a sidewalk or other public area, preferably one with heavy pedestrian traffic,

ORDER – 1

then attempt to engage pedestrians in conversation about their political messages.  They also hand out pamphlets to pedestrians who will accept them.

Plaintiffs have stopped tabling, however, because they fear enforcement of Seattle laws that limit the use of its public rights-of-way.  Christie Decl. ¶ 9.  Those laws are part of Seattle's Street Use Ordinance, which is Subtitle I of the Seattle Municipal Code ("SMC").  The Street Use Ordinance regulates almost any use of a public right-of-way, and most of its provisions have nothing to do with this lawsuit.  At issue here are portions of the Ordinance that require a permit to place objects, including tables, in a public right-of-way.  Plaintiffs have never applied for a permit.

Instead of filing permit applications, Plaintiffs filed suit against the City of Seattle and the directors of the three City agencies responsible for issuing permits via the Street Use Ordinance.  Their complaint alleges that the permit requirement violates the First Amendment (and its analogue at Article I, Section 5 of the Washington Constitution) in many ways: by requiring them to obtain a permit at all, by providing no timetable for acting on permit applications, by requiring them to obtain liability insurance as a condition of obtaining a permit, and by vesting City officials with unfettered discretion to grant or deny permits and set their terms.[1]  Plaintiffs seek declaratory relief and a permanent injunction.

The cross-motions for summary judgment address only Plaintiffs' request for declaratory relief as to its First Amendment claim.  Although the parties' briefing targets many features of the Street Use Ordinance's permit requirement, the court's ruling today focuses on a single overarching feature: the Ordinance's grant of discretion to deny permits.  The court rules that the Ordinance grants overly broad discretion to the Seattle Department of Transportation ("SDOT") to deny street use permits, and that the permit requirement is unconstitutional to the extent that SDOT administers it.

---

[1] Plaintiffs previously agreed to dismiss their claims regarding a City ordinance the applies only to vendors, as well as their request that the court give collateral estoppel effect to a City hearing examiner's ruling on the City's attempt to enforce that ordinance against Plaintiffs.  Dkt. # 19.

ORDER – 2

### III.  ANALYSIS

The cross-motions for summary judgment require the court to draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

**A.    The Street Use Ordinance's General Permit Requirement Applies to Plaintiffs' Tabling and Many Other "Uses" of Seattle's Public Rights of Way.**

**1.    The General Permit Requirement**

The Street Use Ordinance establishes a rule of general application: any "use" of Seattle's public rights-of-way requires a permit.  SMC 15.04.010; SMC 15.02.048 (limiting Ordinance to "use" of "public place"); SMC 15.02.046(H) (defining "Public space" as "public-right-of way . . . including streets, avenues, … sidewalks, . . . and plazas that are not privately owned").  The Ordinance, taken literally, requires a permit to walk down a Seattle sidewalk.  SMC 15.02.048 ("'Use' means . . . occupying all or part of a public place with or without the right to do so.").  Fortunately for Seattle pedestrians, there is no evidence that the City interprets the Ordinance quite that literally.  Instead, the City focuses on specific "uses" named in the Ordinance, which include fencing or scaffolding for construction, digging, curb reconstruction, signs, clocks, awnings, sidewalk cafes, transportation of buildings, billboards, newsstands, and more.  SMC 15.02.048.  The enumerated "uses" also include the one that impacts Plaintiffs'

ORDER – 3

tabling: "placing any material, equipment, inanimate object, or thing in any public place." SMC 15.02.048(A)(4).

The general permit requirement at issue is contained entirely in Chapters 15.02 and 15.04 of the Ordinance. The Ordinance contains more than twenty other chapters, many of which contain their own permit requirements. For example, placement of a "newsstand" is one of the "uses" enumerated in SMC 15.02.048, and thus subject to the permit requirement of SMC 15.04.010. Nonetheless, the Street Use Ordinance contains a separate chapter devoted to newsstands. SMC Ch. 15.14. It declares, without mentioning the general permit requirement, that no permit is necessary to place a newsstand in a public place, except as provided in that chapter. SMC 15.14.020. The court suggests no view on the relationship between the general permit requirement in Chapters 15.02 and 15.04 and other permit requirements in the Street Use Ordinance. It suffices to note that no one suggests that any other permit requirement impacts Plaintiffs. When the court uses the term "permit requirement" in the remainder of this order, it refers solely to the general permit requirement described in Chapters 15.02 and 15.04.

### 2. Application of the Permit Requirement to Plaintiffs' Tabling

There is no dispute that the permit requirement applies to Plaintiff's tabling. As noted, the placement of any "inanimate object" in a public right-of-way is a "use" within the meaning of the Ordinance. SMC § 15.02.048(4). Plaintiffs' tables are just 8 square feet, and nothing contradicts evidence that they have placed their tables so as to leave at least 4 feet of sidewalk clearance. Christie Decl. ¶ 2. One might question whether tabling, as Plaintiffs' practice it, is exempt from the permit requirement by virtue of the Ordinance's declaration that a "'use' shall not include placing an inanimate object in a location and for a limited duration of time that, under the circumstances, no reasonable person could conclude that the public's right to use or enjoy the public place, in whole or in part, has been or potentially could be interfered with." SMC 15.02.048(4). But the parties do not raise that question. Plaintiffs do not mention the exemption. SDOT, who

ORDER – 4

the Ordinance tasks with issuing most permits, has issued "Standards for Issuance or Denial of Street Use Permits" (DePlace Decl., Ex. 3, hereinafter "Standards") that state that placing a "table or sign on the public sidewalk" is a use that requires a permit. Standards § 4.2.1; *see also* SMC 15.04.015(E) (assigning SDOT's Director most authority to enforce the Street Use Ordinance). Brian DePlace, the Interim Director of the SDOT division that issues street use permits, also asserts that Plaintiffs' tabling is subject to the permit requirement. DePlace Decl. ¶ 4; DePlace depo. at 9.[2]

Nothing prohibits Plaintiffs from spreading their political messages without the use of a table. The Ordinance exempts from the permit requirement "handing out leaflets or handbills to passersby," "carrying or holding a sign," and even "conducting a march or parade on a public sidewalk . . . ." Standards § 4.3; DePlace Decl. ¶ 28.[3] It is Plaintiffs' use of a table, not the dissemination of their political messages, that places them within the scope of the Ordinance and its permit requirement.

### 3. Enforcement of the Permit Requirement and Its Impact on Tabling

The court must accept Plaintiffs' uncontradicted evidence that the Ordinance's permit requirement and the City's enforcement of it have caused them to stop tabling. The Ordinance declares any "use" of public spaces in the City without a permit to be "unlawful" SMC 15.04.010, but declares no specific penalty for an unlawful use. Plaintiffs' evidence shows the City has threatened them with fines and prosecution if they engage in tabling without a permit. Christie Decl. ¶ 9. The City has previously cited Plaintiffs because their tabling allegedly violated a City ordinance related to public vending. Levy Decl., Ex. 1. Although a hearing examiner dismissed those citations, the City has suggested to Plaintiffs that it would similarly prosecute them if they engaged in

---

[2] The transcript of Mr. DePlace's deposition is Exhibit 3 to the declaration of Plaintiffs' counsel. Levy Decl. (Dkt. # 23).

[3] Larger demonstrations, including those that are "reasonably expected to cause or result in more than fifty (50) people gathering in a park or other public place," SMC 15.52.005(A)(1)(a), are subject to a portion of the Street Use Ordinance governing "Crowd Control Events." Standards § 4.3.4, § 4.4; SMC Ch. 15.52. Regulation of Crowd Control Events is not at issue in this case.

ORDER – 5

tabling without a permit. *Id.* (Dec. 30, 2013 letter from Assistant City Attorney to Plaintiffs' counsel). In addition to the City's enforcement targeted at Plaintiffs, the Ordinance declares that unpermitted placement of anything in a public right-of-way "may be declared a public nuisance" that the City may "abate[] with or without action at law . . . ." SMC 15.04.012(A), (C). Among other things, the City can seize and destroy an unpermitted table. SMC 15.38.040.

### 4.    The Permit Application and Review Process

A person who wants to engage in a covered "use" must submit a permit application to SDOT. SMC 15.04.020(C). An applicant can either request a specific location for her "use," or she may describe the use and ask for a list of available locations. DePlace Decl. ¶ 7. An applicant must provide a plan or sketch demonstrating how her proposed use will impact the surrounding area. *Id.* The application form for a "use" like Plaintiffs' tabling is four pages long. *Id.*, Ex. 1. In addition to the information that SMC 15.04.025 requires, the application form specifies that for uses including "Tables and Chairs," an applicant must present proof of at least one million dollars in liability insurance. *Id.*

In the general case, nothing mandates approval of any permit application. SMC 15.02.100 ("Issuing permits under Title 15 is discretionary; Title 15 does not create any right to a permit."). SDOT's Standards also declare that, in the general case, "[d]ecisions to issue or deny applications for permits are within the discretion of the Department. Standards § 6.1.

The court will consider to what extent the Ordinance, the Standards, and City practice limit the unfettered discretion that applies, in the general case, to a decision to grant, deny, or issue no decision on a permit application. Before doing so, the court examines the parameters of a First Amendment challenge to the discretion granted to a licensor of expressive activity.

ORDER – 6

**B.    Although the First Amendment Protects Tabling, Restrictions on The Time, Place, and Manner of Tabling May Be Constitutional.**

The First Amendment protects Plaintiffs' tabling.  In *ACLU v. City of Las Vegas*, 466 F.3d 784, 799 (9th Cir. 2006), the court held that "the erection of tables in a public forum is expressive activity protected by our Constitution to the extent that tables facilitate the dissemination of First Amendment speech."   Plaintiffs' uncontradicted evidence establishes that tabling not only facilitates the dissemination of their political messages, but is more effective than disseminating that message without a table.  Christie Decl. ¶¶ 3-5.  Tables make it easier for Plaintiffs to display and distribute pamphlets and political literature.  *Id.*  Plaintiffs' representatives have tried wearing signs, but found that tabling is a better means both of displaying the signs and of causing pedestrians to remember their messages.  *Id.*  Tabling, at least as Plaintiffs practice it, is expressive conduct within the scope of the First Amendment.

That the First Amendment protects tabling does not necessarily prohibit the City from regulating it.  In some circumstances, a court may uphold even wholesale bans on particular methods of communication.  *E.g.*, *Kovacs v. Cooper*, 336 U.S. 77, 78, 89 (1949) (upholding law banning use of "sound trucks" on city streets).  Indeed, although the Ninth Circuit has declined to decide the issue, the Eleventh Circuit has upheld a tabling ban.  *Compare ACLU v. City of Las Vegas*, 466 F.3d at 800 n.18 (declining to decide whether an ordinance banning tabling would violate First Amendment), *with Int'l Caucus of Labor Committees v. City of Montgomery*, 111 F.3d 1548, 1550 (11th Cir. 1997) ("a ban against tables on sidewalks . . . satisfies the time, place and manner test required when the actions of a city implicate the First Amendment).  Seattle does not ban tabling, it merely includes tabling among the uses of its public rights-of-way that require a permit.  Plaintiffs concede that even though the Street Use Ordinance's permit requirement operates as a prior restraint on their speech, precedent compels the conclusion that the court should analyze it as a time, place, and manner regulation.  Pltfs.' Mot. at 10-11; *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) (where permit

ORDER – 7

scheme "does not authorize a licensor to pass judgment on the content of speech," it is a "time, place, and manner regulation"); *Santa Monica Food Not Bombs*, 450 F.3d at 1036 ("[A]lthough schemes imposing prior restraints on protected speech face a heavy presumption against validity, . . . time, place, and manner regulations of speech in public areas bear a somewhat lighter burden, so long as they are content neutral.").

A time, place, and manner regulation that includes a permit requirement is valid if it meets several constitutional requirements. First, it must not "delegate overly broad licensing discretion to a government official." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992). It must be content-neutral. *Id.* It must be "narrowly tailored to serve a significant governmental interest," and it "must leave open ample alternatives for communication." *Id.*; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A "[t]ime, place, and manner restriction need not . . . be the least restrictive alternative available." *Santa Monica Food Not Bombs*, 450 F.3d at 1041; *see also Ward*, 491 U.S. at 798 (holding that a time, place, and manner restriction "need not be the least restrictive or least intrusive means" of serving the government's interest).

Plaintiffs concede that the permit requirement is facially content-neutral. Tabling and other expressive activity within the scope of the Ordinance require a permit whether the expressive activity is political or artistic, left-leaning or right-leaning, pro-government or anti-authoritarian. There is no evidence that the City has used the permit requirement to favor some messages and not others, and nothing contradicts Mr. DePlace's declaration that the SDOT staffers who review permit applications do not "consider any particular message that the permit applicant intends to convey . . . ." DePlace Decl. ¶ 19.

The Ordinance's facially content-neutral permit requirement is unconstitutional because it *invites* content-based discrimination by failing to place meaningful restrictions on SDOT's discretion to grant permit applications, even though there is no evidence that the City or its officials have ever accepted that invitation. The court now explains that conclusion.

ORDER – 8

**C.**  **The Street Use Ordinance Gives Licensing Officials Unfettered Discretion to Grant or Deny Permit Applications.**

The First Amendment demands that a licensing scheme "contain adequate standards to guide [an] official's discretion and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323.  Licensing schemes that do not cabin a licensor's discretion raise the specter of censorship even in laws, like the Street Use Ordinance, that are facially content-neutral.  *Id.* ("Where the licensing official enjoys unduly broad discretion . . . there is a risk that he will favor or disfavor speech based on its content."); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).  A permit requirement that gives its licensor boundless discretion encourages speakers like Plaintiffs to censor themselves, rather than take the risk that the licensor will censor them. *Plain Dealer*, 486 U.S. at 757.  That danger is present "even if the [licensor's] discretion and power are never actually abused." *Id.*  Standards that limit a licensor's discretion "eliminate this danger by adding an element of certainty fatal to self-censorship." *Id.* at 758.  Limitless discretion also permits a licensor to disguise censorship, making it difficult to distinguish, in any individual case, "between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." *Id.*  A licensing scheme that properly limits a licensor's discretion "provide[s] the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." *Id.*  Absent those guideposts, the licensor can employ "*post hoc* rationalizations," or use "shifting or illegitimate criteria," thus "making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.*

**1.**  **Plaintiffs, Who Have Never Applied for a Permit, Can Facially Challenge the Street Ordinance's Grant of Discretion to SDOT.**

The censorial concerns that animate the inquiry into whether a permit scheme confers too much discretion also allow parties like Plaintiffs to mount a facial attack on the permit scheme.  Here, the City does not dispute that Plaintiffs can take advantage of

ORDER – 9

"special standing principles [that] apply in First Amendment cases." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1033 (9th Cir. 2006).  Ordinary standing principles would require Plaintiffs to demonstrate that SDOT had denied one of their permit applications, allowing them to bring an as-applied challenge to that denial. But a person who self-censors in response to a licensing scheme will never apply for a permit, and even a plaintiff who sues to challenge the denial of a permit application will have difficulty proving censorship in an as-applied challenge where no standards control the licensor's discretion. *Plain Dealer*, 486 U.S. at 758-59.  For that reason, a "facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech . . . ." *Id.* at 759.  That is true even in cases like this one, where Plaintiffs have never applied for a permit for tabling. *Santa Monica Food Not Bombs*, 450 F.3d at 1034.  Indeed, a facial challenge lies even in cases, like this one, where there is no evidence that the City has *ever* denied a permit application. *Kaahumanu v. Hawaii*, 682 F.3d 789, 807 (9th Cir. 2012) (invalidating grant of discretion even though the "discretionary power . . . ha[d] never been exercised").

A facial challenge to a licensor's discretion requires only a plaintiff whose conduct falls within the scope of a law granting licensing discretion and a law with a close enough nexus to expression or expression-related conduct to pose a substantial threat of censorship. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1020 (9th Cir. 2009).  There is no dispute that Plaintiffs' tabling falls within the scope of the Street Use Ordinance's permit requirement.  That suffices to establish their Article III standing. *Id.* at 1020.  That leaves only the prudential concern about the nexus between the permit requirement and protected expression.  Although the permit requirement applies to much conduct (construction, sidewalk cafes, building transportation, and more) that is not expressive, it also expressly targets expressive conduct, including the placement of signs, the use of sound amplifiers, newsstands, and more. *See S. Or. Barter*

ORDER – 10

*Fair v. Jackson County*, 272 F.3d 1128, 1135-36 (allowing facial challenge to licensing law that was "broad enough to cover gatherings that are expressive"). Precedent permitting a facial challenge to a licensor's unfettered discretion typically considers ordinances and statutes more narrowly focused on expressive activity. In *Plain Dealer*, for example, the Court considered only an ordinance requiring a permit to place a newsstand on public property. 485 U.S. at 760 (noting that licensing scheme was "directed narrowly and specifically at expression or conduct commonly associated with expression"); *see also Long Beach Area Peace Network*, 574 F.3d at 1019-20 (permitting facial challenge to ordinance regulating mass gatherings); *Kaahumanu v. Hawaii*, 682 F.2d 789, 802 (9th Cir. 2012) (permitting facial challenge to law granting licensing discretion for weddings on public beaches). In another case, the court might be forced to decide whether the Street Use Ordinance's broad scope, which sweeps in much conduct that is categorically not expressive, makes its permit requirement immune to a facial challenge. In this case, however, the City does not contest that Plaintiffs may facially challenge the licensing discretion that the Street Use Ordinance confers on SDOT.

Plaintiffs do not, however, have standing to bring a facial challenge to the permit requirement to the extent it delegates discretion to an entity other than SDOT. The Street Use Ordinance delegates licensing power to at least three City departments: SDOT, the Department of Parks and Recreation, and the Department of Planning and Development. SMC 15.04.015. Although Plaintiffs have sued the head of each of those departments, there is no evidence that Plaintiffs engage in conduct that would require a permit from any agency except SDOT. The Department of Planning and Development appears to have authority solely over permits relating to construction and tree removal. SMC 15.04.015(A). The Department of Parks and Recreation can issue street use permits in Seattle parks, including permits for expressive activity, SMC 15.04.015(C), but there is no evidence that Plaintiffs wish to engage in tabling in parks. There is no indication (other than naming other department heads as Defendants) that Plaintiffs wish to

ORDER – 11

challenge the authority of any agency other than SDOT.  Even if that were not the case, there is no evidence before the court as to any other agency's interpretation of the permit requirement.  The court thus considers only a facial challenge to the permit requirement as SDOT implements it.

### 2. The Court Considers the Permit Requirement as Described in the Ordinance and Standards.

To determine the limits on SDOT's discretion to issue permits, the court must consider the Street Use Ordinance and SDOT's binding interpretation of the Ordinance in the Standards.  *Forsyth County*, 505 U.S. at 131 (directing courts to consider the government's "authoritative constructions" of an ordinance); *Plain Dealer*, 486 U.S. at 770 (directing courts to consider "binding judicial or administrative construction" of an ordinance).  The court must also consider SDOT's "implementation and interpretation" of the permit requirement, *Forsyth County*, 505 U.S. at 131, as well as its "well-established practice," *Plain Dealer*, 486 U.S. at 770.  The court begins with the sole documents that govern SDOT's discretion: the Ordinance and Standards.[4]

With one exception, both the Ordinance and Standards trumpet SDOT's unlimited discretion to make permit decisions.  The Ordinance and Standards declare that in the general case, SDOT is under no mandate to grant permit applications or even to issue a decision on them.  SMC 15.02.100 ("Issuing permits under Title 15 is discretionary; Title 15 does not create any right to a permit."); Standards § 6.1 ("Decisions to issue or deny applications for permits are within the discretion of the Department.").  Although the Ordinance declares that SDOT "shall examine each application for a permit for compliance with Title 15," SMC 15.04.030(A), almost nothing mandates that SDOT do anything else.  SDOT "may approve the application," SMC 15.04.035(A), but there is no

---

[4] Mr. DePlace declares that some requirements relevant to SDOT's approval of permit applications are contained within a chapter of its "Right of Way Improvements Manual." DePlace Decl. ¶ 11 & Ex. 4.  Although the court has no reason to doubt Mr. DePlace, neither he nor the City cites a single provision of this 85-page chapter, which appears to be devoted to describing specifications for long-term changes to Seattle's public rights-of-way.  The court does not further consider the Right of Way Improvements Manual.

ORDER – 12

mandate that it do so, even for an application that meets all requirements of Title 15.[5] The Ordinance specifies a host of "[f]actors for consideration in evaluating an application," including the rights of nearby property owners, travel and transportation concerns, impact on public safety, environmental impact, and similar concerns. SMC 15.04.035(C). But those considerations are not exclusive, and SDOT may consider any additional factors it prefers. *Id.* ("Factors for consideration . . . include, but are not limited to" enumerated factors). The Standards are even looser, stating only that in "exercising [its] discretion . . . SDOT "may evaluate the application in light of" specified factors.

The only express limitation on SDOT's discretion to grant, deny, or issue no decision on a permit application comes in a portion of the Standards that acknowledges that SDOT's "discretion in making . . . [permit] decisions may be limited under certain circumstances." Standards § 6.4. When a proposed use would "unreasonably interfere" with the public's use of a place, would exceed the public's easement on adjoining private property, or would violate City law or policy, SDOT must deny a permit. Standards § 6.4.1. In addition, SDOT "may, under certain circumstances, be required to issue a permit (*e.g.*[,] if the First Amendment requires issuance of a particular permit)." Standards § 6.4.2. The court will soon consider the latter provision, which it will call the "First Amendment Savings Clause" or "Savings Clause." For the moment, the Savings Clause serves only to emphasize that when it is not at issue, SDOT has boundless discretion to deny permit applications.

SDOT also invites the court to consider an alternate version of the permit requirement that Mr. DePlace describes in his declaration. Mr. DePlace's version mirrors

---

[5] The Ordinance attempts to dispel any confusion about its use of the words "may" and "shall":

> Unless the context clearly indicates otherwise, the word "may" or "is authorized to" means that the City or its official has discretion to take an action or decline to do so. The word "shall" expresses an intention that an action be taken or a requirement be met, but if the sentence is negative, "shall" is prohibitory.

SMC 15.02.035.

ORDER – 13

the Ordinance and Standards in that SDOT permit staffers consider a list of content-neutral standards compiled from the Ordinance and Standards.  DePlace Decl. ¶¶ 11-18.  But Mr. DePlace's version also contain limits found nowhere in the Ordinance or Standards.  Whereas the Ordinance and Standards mandate approval of a permit application only when the First Amendment requires approval, Mr. DePlace declares that if an SDOT "Permit Specialist determines that a proposed use . . . can be accommodated at a specific location, *the permit will be granted*."  DePlace Decl. ¶ 19 (emphasis added).  Whereas the Ordinance and Standards require no explanation when SDOT denies a permit, Mr. DePlace declares that if a "proposed use cannot be accommodated, and no alternatives are acceptable, the permit applicant will receive a written denial from [SDOT] that sets forth the reasons for the denial."  DePlace Decl. ¶ 20.

This might be a different case if the court could rely on the version of the permit requirement that Mr. DePlace describes.  He describes a permit scheme where permits are mandatory, provided that the permit application meets a series of what appear to be objective criteria.  Whereas the Standards and Ordinance describe a permit scheme where SDOT's boundless discretion to deny applications gives way only when the First Amendment demands otherwise, Mr. DePlace describes a permit scheme where SDOT has no discretion at all, except perhaps in proposing alternative locations when it cannot accommodate the applicant's proposed locations.  DePlace Decl. ¶ 18.  Whereas the Standards and Ordinance allow SDOT to pocket or deny a permit application without explanation, Mr. DePlace assures the court that SDOT will provide a written explanation for any denial, thus enabling effective administrative and judicial review.  *See* SMC 15.04.112 (allowing applicant to request that SDOT's Director review an adverse permit decision); SMC 15.02.090 (allowing applicant asserting First Amendment rights to seek review of adverse permit decision in Seattle Municipal Court).

The court cannot rely on Mr. DePlace's description of SDOT's implementation of the Street Use Ordinance's permit requirement.  That is not because the court doubts the

ORDER – 14

veracity of his description.  Indeed, in considering whether to grant summary judgment to Plaintiffs, the court is compelled to accept Mr. DePlace's uncontradicted evidence.  The reason that the court cannot rely on his description is that there is no evidence that the public can access it.  As the court has noted, one of the reasons that permit schemes that confer too much discretion are invalid is that they promote self-censorship.  Rather than chance a censorial decision, a speaker subject to the permit requirement may either modify his speech or forego it entirely.  *Plain Dealer*, 486 U.S. at 757-58.  What value then, is a permit requirement that at licensing official like Mr. DePlace keeps to himself?  Plaintiffs, like any person considering applying for a permit for expressive conduct within the scope of the Street Use Ordinance, can rely on the Ordinance and Standards.  This litigation illustrates that prospective applicants cannot rely on Mr. DePlace's version of the permit requirement.  After months of litigation, including a deposition of Mr. DePlace in which he did not mention his version of the Permit requirement, Plaintiffs filed a motion for summary judgment challenging the permit requirement described in the Ordinance and Standards.  That led to a cross-motion from the City that included, for the first time, the permit requirement as Mr. DePlace describes it.  The court therefore concludes that it cannot rely on Mr. DePlace's description as evidence of a "well-established practice" defining the permit requirement.  *See Plain Dealer*, 486 U.S. at 770.  Although a court may consider the government's "implementation and interpretation" of a permit requirement, *Forsyth County*, 505 U.S. at 131, this court will not uphold a statute based on evidence of interpretation or implementation that is not available to the public.  If the City wishes to supplement the permit requirement of the Ordinance and Standards with the permit requirement Mr. DePlace describes, it must make that decision apparent to the public.

ORDER – 15

### 3.     The Permit Requirement in the Ordinance and Standards Confers Unduly Broad Discretion on SDOT to Deny Permit Applications.

The Ordinance and Standards contain none of the hallmarks of laws that courts have found provide adequate guideposts for discretion in granting or denying permits. Those laws make the issuance of permits mandatory, except in reasonably specific circumstances.  *E.g.*, *Thomas*, 534 U.S. at 318-19 & n.1 (ordinance required officials to grant or deny permit and to deny permits only for enumerated reasons); *Long Beach Area Peace Network*, 574 U.S. at 1026 ("The City Manager 'shall' grant a permit for a special event if certain criteria are satisfied."); *Santa Monica Food Not Bombs*, 450 F.3d at 1028 ("[T]he Community Events Committee *shall* issue a permit if certain enumerated criteria are met.") (internal quotation omitted, emphasis in *Santa Monica Food Not Bombs*); *Kaahumanu*, 682 F.3d at 804 ("DNLR has no discretion to deny a registration if the applicant fills out the form and submits proof of insurance.").  The Ordinance and Standards mandate issuance of a permit, if at all, only to the extent that the First Amendment Savings Clause mandates issuance of a permit.

Constitutional ordinances tend to require the government to explain the denial of a permit, which promotes effective judicial review for a disappointed applicant.  *E.g.*, *Thomas*, 534 U.S. at 319; *Long Beach Area Peace Network*, 574 U.S. at 1028 (ordinance required "written explanation for a decision that impose[d] conditions on the permit"). One of the considerations leading to the invalidation of a Seattle parade permit requirement was that it required no explanation of a decision to move a parade from a street to the sidewalk, thus leaving no "decision-making trail for [a court] to review . . . ." *Oct. 22 Coalition to Stop Police Brutality v. City of Seattle*, 550 F.3d 788, 800, 802 (9th Cir. 2008).

Also relevant is that the Ordinance and Standards place no time limit on processing permit applications.  The court does not question evidence that SDOT aspires to process applications quickly, and that an applicant for a use like Plaintiffs' tabling could receive a permit on the same day she applied, although it might take up to 48 hours.

ORDER – 16

DePlace Decl. ¶ 23; DePlace depo. at 19, 44-45.  What is missing is evidence that a permit applicant would know that SDOT aspires to decide permit applications quickly, which again raises the risk of self-censorship.  Constitutional ordinances tend to place time limits on a permit decision.  *E.g.*, *Thomas*, 534 U.S. at 318 (ordinance required officials to issue permit decision in 14 days, with an option for a 14-day extension with notice to applicant); *Long Beach Area Peace Network*, 574 U.S. at 1026 (permit scheme required 60 days advance notice for events not involving expressive activity, between 3 and 10 days for expressive activities, and no permits at all for "spontaneous" expressive activity "occasioned by events coming into public knowledge within five days of the event); *Santa Monica Food Not Bombs*, 450 F.3d at 1028 (ordinance "spell[ed] out the timing of the review process); *Kaahumanu*, 682 F.3d at 804 (permits issued "immediately online" to registered applicants after payment of fee and submission of details).  A time limit is not a mandatory component of constitutional permit requirement.  *S. Or. Barter Fair*, 372 F.3d at 1138 (holding that a content-neutral permit requirement "need not include . . . a deadline for consideration by the governing body").  The lack of a time limit for informing a permit applicant of a licensor's decision is nonetheless a relevant consideration in assessing the breadth of that licensor's discretion.

The permit requirement of the Ordinance and Standards shares flaws with permit requirements that courts have invalidated.  The state law in *Kaahumanu*, for example, did not confer too much discretion in granting or denying permits, 682 F.3d at 805, but it granted unfettered discretion in revoking permits or adding conditions to them.  *Id.* at 805 (ordinance declared that a "permit is revocable at anytime for any reason in the sole and absolute discretion of the [licensing official]"), at 806 (ordinance allowed official to "impose additional[] terms and conditions as it deems necessary or appropriate").  Even though there was "nothing in the record to indicate that [licensing officials] had ever used [their power] to favor some speakers and suppress others," and even though "the discretionary power reserved in [those clauses] ha[d] never been exercised," the court

ORDER – 17

held them unconstitutional because the "potential for the exercise of" the unbounded discretionary power existed.  *Id.* at 807.  The discretion that the Street Use Ordinance grants to SDOT in granting or denying permits, like the discretion in *Kaahumanu* to revoke or condition permits, is unbounded.  In *Long Beach Area Peace Network*, the court considered a clause that allowed a city council to fund or waive the application and service fees required for event permits.  574 F.3d at 1041.  The court struck down that provision because "the lack of specific articulated bases for making this decision compels the conclusion that the City Council has unbridled discretion."  *Id.* at 1043.  Although the Street Use Ordinance lists some factors for SDOT's consideration, SDOT can make the decision at its whim based on any unenumerated factors it prefers.  The ordinance that the *Plain Dealer* Court invalidated allowed a town's mayor to issue permits for placement of newsstands on public property with several mandatory conditions, as well as "other terms and conditions deemed necessary and reasonable by the Mayor."  *Id.* at 754 n.2.  The Court struck the ordinance down because it "contain[ed] no explicit limits on the mayor's discretion."  *Id.* at 769.  The court finds no more limits on SDOT's discretion in this case.

None of the considerations the court has just described are dispositive, they are instead the "totality of the factors" that permit the court to "assess wither this Ordinance contains adequate safeguards to protect against official abuse."  *Oct. 22 Coalition to Stop Police Brutality*, 550 F.3d at 799.  Based on those factors, the court concludes that the Ordinance and Standards do not sufficiently confine SDOT's discretion to deny permits.  What remains is for the court to decide whether the First Amendment Savings Clause provides the guidelines for discretion that are missing from the remainder of the Ordinance and Standards.

### 4.      The First Amendment Savings Clause Contains an Illusory Mandate That Does Not Generally (If Ever) Displace SDOT's Undue Discretion to Deny Permit Applications for Expressive Conduct.

The Standards' First Amendment Savings Clause declares that in applications for permits for expressive activity, SDOT's otherwise broad discretion gives way to an

ORDER – 18

apparent mandate to issue a permit where the First Amendment requires it.  Standards § 6.4.2.  A close examination, however, reveals that the Savings Clause contains no mandate, or at least no mandate that suffices to limit SDOT's discretion.

To begin, the permit applicant must inform SDOT if it "contends that the First Amendment requires issuance of the requested permit . . . ."  Standards § 6.4.2.  The court observes that the permit application in the record does not inform any applicant of this requirement.  The court does not decide, however, whether SDOT may delegate to applicants its obligation to justify any infringement on speech.  *See Berger v. City of Seattle*, 569 F.3d 1029, 1048 (9th Cir. 2009) (noting that government bears the burden to justify time, place, and manner restrictions); *Comite de Jornaleros v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (noting general First Amendment principle that government bears burden of justifying a restriction on free speech).  Instead, the court points out that it is difficult, if not impossible, to determine what SDOT means by a permit whose issuance the First Amendment mandates.  The Street Use Ordinance does not target expression, it targets conduct associated with expression.  In some instances, the government may entirely prohibit conduct associated with expression.  The court has already pointed out the possibility that a ban on tabling would pass constitutional muster.  *Compare ACLU v. City of Las Vegas*, 466 F.3d at 800 n.18, *with Int'l Caucus of Labor Committees v. City of Montgomery*, 111 F.3d 1548, 1550 (11th Cir. 1997).  So in what circumstances is a permit for tabling constitutionally required?  The Ordinance and Standards offer no assistance in answering that question.  More important than the answer, at least in this case, is an explanation of how SDOT would decide that a permit is constitutionally required, thus triggering the First Amendment Savings Clause.

Putting aside questions about the City's authority to ban some expression-related conduct entirely, permit schemes that impinge on expression are constitutional (within limits) because content-neutral considerations frequently allow a city to deny permit applications or impose conditions on them.  The search for circumstances in which a

ORDER – 19

permit is "constitutionally required" is thus likely to be an elusive one.  For example, in *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010), the court held that a city's ban on tattooing was not a permissible time, place, and manner restriction.  But that is a far cry from holding that a city must grant every permit for a tattoo parlor.  A host of considerations might allow a city to deny a prospective tattooist's business license, whereas others might not.  A hypothetical ordinance declaring that a city "has discretion to issue business licenses, but shall grant licenses when the First Amendment requires it" does not describe limits on the city's discretion; it begs the question of what those limits are.

The First Amendment Savings Clause is not materially different from the hypothetical licensing scheme the court just described.  That is so not only because of its circular permits-required-when-the-First-Amendment-requires-them language, but because the directions that follow that language offer no answer as to when the First Amendment requires anything.  The Savings Clause requires a permit applicant to satisfy a "threshold burden" to show that her proposed use is entitled to constitutional protection by making one of three showings:

   a.  The proposed "use" is itself a constitutionally protected activity;

   b.   The proposed use is inextricably intertwined with a constitutionally protected activity, such that the activity and the proposed use are inseparable and whatever constitutional protections which are afforded the activity must be extended to the use; or,

   c.  In order to engage in the constitutionally protected activity, it is reasonably necessary to engage in the proposed use (i.e.[,] the applicant cannot engage in the constitutionally protected activity without also engaging in the proposed use of the public place).

Standards § 6.4.2.  Plaintiffs could presumably make the first showing, given the Ninth Circuit's holding that tabling is constitutionally protected when it "facilitate[s] the dissemination of First Amendment speech."  *ACLU v. City of Las Vegas*, 466 F.3d at 799.  What then?  The Standards direct SDOT to consider the circumstances listed in § 6.4.1

ORDER – 20

that mandate the denial of a permit as well as the interests of any private owner of the public place.  Standards § 6.4.3.  If those circumstances are in play, SDOT can "attempt to identify reasonable alternative(s)," considering the factors listed in Standards § 6.2, and can issue an alternate permit if it identifies a reasonable alternative.  Standards § 6.4.3.  The court assumes, purely for the sake of argument, that somewhere in that maze of regulation is a viable standard for the exercise of SDOT's discretion in the circumstances described in § 6.4.3.  The Standards are silent as to SDOT's discretion in any other circumstances, and thus contain no mandate in any other circumstances.

Imagine, for example, that Plaintiffs applied for a permit to use a downtown sidewalk unquestionably large enough to accommodate their table and pedestrian traffic on a day and time where there was no competing use and no concern from an adjacent landowner.  Imagine further that they somehow modified SDOT's permit application form to declare their belief that the First Amendment required a permit in this instance, and that SDOT decreed that they met the "threshold burden" identified in Standards § 6.4.2.  Then imagine that SDOT determined that none of the considerations identified in § 6.4.3 weighed in favor of proposing a "reasonable alternative."  What then?  The Standards are utterly silent.  They neither mandate nor prohibit any course of action.  Although the Standards purport to create guideposts that apply when First Amendment concerns are in play, the only guideposts they create are for proposing "reasonable alternatives" to a permit applicant's proposed use.  The court need not decide whether those guideposts are adequate in the limited circumstances in which they apply.  The absence of a mandate that applies in other circumstances is fatal to the Ordinance's permit scheme.

The court has focused on the First Amendment Savings Clause, because it is the only portion of the Ordinance and Standards that attempts to explicitly limit SDOT's discretion to deny permits.  The Savings Clause is perhaps SDOT's effort to comply with the Ordinance's command that it "shall be interpreted in a manner consistent with the

ORDER – 21

First and Fourteenth Amendments to the United States Constitution . . . ."  SMC

15.02.027.  Other aspects of the Ordinance and Standards acknowledge that different

rules might apply for conduct to which the First Amendment applies.  SDOT "shall

suspend the application of any particular section of the [Ordinance] or waive compliance

with a requirement" of the Ordinance when "required by the United States Constitution

or the Washington Constitution . . . ."  SMC 15.04.017.  The Ordinance requires SDOT to

"maintain a record open for public inspection disclosing the suspensions and waivers

granted," *id.*, but that record, assuming it exists, is not part of the record in this case.

Although the court does not doubt Defendants' commitment to applying the Street Use

Ordinance's permit requirement constitutionally, that commitment has not translated to

adequate publicly-disclosed limits on SDOT's discretion to deny permits.  Absent those

limits, the court cannot presume that the City or SDOT will exercise their discretion in

good faith.  *Plain Dealer*, 486 U.S. at 770.

## D.   The Court Declines to Resolve the Parties' Other Disputes about the Permit Requirement.

For the reasons stated above, the court rules that the permit requirement of the

Street Use Ordinance, as SDOT administers it, is facially invalid because it confers

overly broad discretion to deny permits.

That ruling makes it unnecessary to reach aspects of the parties' motions that

depend on a valid permit requirement.  For example, the court will not address the

constitutionality of the Street Use Ordinance's $1 million liability insurance requirement,

either on its face or as applied to Plaintiffs.  SMC 15.04.045; DePlace Decl. ¶ 7 & Ex. 2;

DePlace depo. at 22-24.  The insurance requirement applies only to permittees and thus

does not apply without a permit requirement.  SMC 15.04.045.  For the same reason, the

court will not reach Plaintiffs' motion to strike evidence Defendants submitted to address

the availability of insurance for political action committees.  The court also need not

decide whether the Ordinance's grant of discretion to waive the insurance requirement

ORDER – 22

(SMC 15.04.037(B)(7)) is, like the permit requirement in which it is embedded, a grant of undue discretion to SDOT. The court observes that SDOT has not "typically" granted waivers, if it ever has. DePlace depo. at 25.

Similarly, Plaintiffs' objection that the Ordinance places no limit on how long SDOT takes to decide a permit application is moot where no permit requirement applies. The same is true of Plaintiff's insistence that the permit requirement must contain an exception for instances in which Plaintiffs want to table in rapid response to current events.

The foregoing challenges, which Plaintiffs raise on an as-applied basis, would require the court to assess Plaintiffs' standing to bring them in light of their failure to apply for a permit. If Plaintiffs could establish standing, the court would assess whether these aspects of the permit requirement are narrowly tailored and whether they leave open alternate avenues for communication.[6] But because the Ordinance and Standards give SDOT unduly broad discretion to deny permit applications, the court need not reach those issues. *See Oct. 22 Coalition to Stop Police Brutality*, 550 F.3d at 798 ("If the Ordinance delegates overly broad discretion to police officials, we need not determine if it satisfies the remaining components of the [time, place, and manner] test.").

## IV. ADDITIONAL PROCEEDINGS

If the court incorporates today's ruling into a final judgment, it will likely have consequences broader than anyone prefers. Plaintiffs hope to protect themselves and speakers like them from the prospect of content-based discrimination; the court presumes that no one hopes to demolish a permit system for street and sidewalk uses that raise no

---

[6] Defendants emphasize that Plaintiffs have an obvious alternative for communicating their messages – they can engage pedestrians and distribute pamphlets without the use of a table and without need for a permit. The existence of permit-free speech alternatives is, however, not a basis to overlook a grant of overbroad discretion in issuing permits. *See Oct. 22 Coalition to Stop Police Brutality*, 550 F.3d at 796 (rejecting suggesting that a facial challenge is unavailable where a licensing scheme guarantees access to another forum for speaking). Were it otherwise, the city in *Plain Dealer* could have salvaged its discretionary newsstand licensing scheme merely by noting that publishers could distribute newspapers by hand.

ORDER – 23

First Amendment concerns.  Certainly the court does not relish issuing a ruling that would potentially allow, for example, any landowner to erect a barricade to keep pedestrians off a sidewalk abutting her property.  As the court has noted, there are permit requirements in the Street Use Ordinance that are not at issue in this suit, but the court has no comprehensive picture of the activities subject to those requirements.

For the time being, no one has asked for a final judgment.  Perhaps that is because the cross-motions do not address Plaintiffs' request for a permanent injunction or their claim that the Street Use Ordinance violates the Washington Constitution.  Perhaps that is because the parties have not addressed whether there is any basis to include the heads of the Parks Department and Department of Planning and Development as Defendants.  In any event, the parties must address how to bring this action to judgment.  The court therefore orders as follows:

1) No later than March 12, 2015, the parties shall meet and confer as to their preferences for bringing this action to judgment.  The parties shall discuss at least the following topics:

   a) their preferences for resolving Plaintiffs' Washington Constitution claim and their request for a permanent injunction;

   b) whether a final judgment can issue against the Superintendent of Parks and Recreation and the Director of the Department of Planning and Development;

   c) whether the parties believe that there are any factual disputes that necessitate a trial;

   d) whether Defendants wish to delay judgment in this case while they develop a new ordinance or binding interpretation of the current Ordinance that establishes guideposts for SDOT's discretion, and, if so, whether Plaintiffs object;

ORDER – 24

e) whether there is any basis to sever the permit requirement such that the court's ruling today applies only to expressive conduct; and

f) whether preliminary injunctive relief is appropriate in the event that a final judgment will not issue promptly.

2) No later than March 23, 2015, the parties shall submit a joint statement that addresses their agreements and disagreements as to the issues the court just listed.

## V.  CONCLUSION

For the reasons stated above, the court GRANTS Plaintiffs' motion for summary judgment (Dkt. # 21) in part and DENIES Defendants' motion (Dkt. # 25).  The parties shall comply with the order in Part IV.

DATED this 24th day of February, 2015.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 25